## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| BARBARA REEDER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:11-CV-00141 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Barbara Reeder appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]

(*See* Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Reeder was last insured for DIB on June 30, 2007 (Tr. 381-82); therefore, she must

establish that she was disabled as of that date to recover DIB benefits, *Stevenson v. Chater*, 105

F.3d 1151, 1154 (7th Cir. 1997).  Reeder first applied for DIB in December 2003, alleging

disability as of December 6, 2002.  (Tr. 40-42.)  Administrative Law Judge ("ALJ") John S.

Pope rendered an unfavorable decision to Reeder in September 2006.  (Tr. 12-17.)  On appeal,

this Court reversed and remanded the Commissioner's decision on March 19, 2008, based on the

ALJ's flawed credibility evaluation.  (Tr. 448-63.)

In October 2006, Reeder filed a subsequent application for DIB, alleging disability as of

---

[1] All parties have consented to the Magistrate Judge.  (Docket # 14); *see* 28 U.S.C. § 636(c).

September 28, 2006.  (Tr. 464-68.)  The Commissioner denied her subsequent application initially and upon reconsideration (Tr. 428-29, 436-38, 440-43), and Reeder requested an administrative hearing on this second claim (Tr. 435).  In April 2008, the Appeals Council remanded Reeder's initial application and consolidated Reeder's applications.  (Tr. 446-47.)

On July 14, 2009, ALJ Pope conducted a new hearing on Reeder's consolidated claim, at which Reeder, who was represented by counsel, and a vocational expert ("VE") testified.  (Tr. 589-634.)  The ALJ issued an unfavorable decision to Reeder on December 16, 2009, concluding that she was not disabled because she could perform a significant number of jobs in the national economy despite the limitations caused by her impairments.  (Tr. 381-96.)  The Appeals Council denied Reeder's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 297-300.)

Reeder filed a complaint with this Court on April 26, 2011, seeking relief from the Commissioner's final decision.  (Docket # 1.)  She raises only one argument in her appeal: that the ALJ improperly evaluated the opinion of Dr. Lisa Lane, her treating physician.  (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 17-21.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

As of her date last insured, Reeder was forty-eight years old (Tr. 40, 395), had a high school education (Tr. 66), and possessed work experience as a cashier, clerk, and sewer (Tr. 105, 292-93, 619-20).  Reeder stopped working in 2002 when she was laid off from her job.  (Tr. 270.)  Reeder alleges that she became disabled as of December 6, 2002, due to osteoarthritis of

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 634-page administrative record necessary to the decision.

both knees, low back problems, obesity, hypothyroidism, hypertension, coccygeal inflammation, a mild bilateral pes plinus, asthma, peripheral neuropathy, non-insulin dependent diabetes, edema, and gastroesophageal reflux disease ("GERD").  (Opening Br. 2.)

### B.  Reeder's Testimony at the Hearings

At the time of the first hearing in February 2006, Reeder reported that she was 5'7" tall and weighed between 370 and 390 pounds.  (Tr. 269.)  When asked what medical conditions affect her ability to work, Reeder stated: "Just the arthritis and the shortness of breath and not being able to stand and sit," explaining that her arthritis was primarily centered in her back, tailbone, both knees, and left ankle.  (Tr. 271-72, 279.)  She reported that her back pain was a "sharp pain" that she experienced "all the time" but that her knee pain was not "too bad," stating that her knees bother her "not too much every day."  (Tr. 280.)  Reeder elaborated that her pain worsened with activity and that sitting in a recliner or lying in bed relieved it.  (Tr. 281.)  Reeder further stated that in an eight-hour workday she could walk two hours, that is, "maybe 10, 15 minutes" every hour; stand for one hour; and sit for "maybe three" hours.  (Tr. 282.)  Reeder also reported that her hands got "stiff and sore" from arthritis, which limits her activity somewhat. (Tr. 286.)  She noted that she had been seeing Dr. Lisa Lane, her family doctor, for about ten years.  (Tr. 273.)

By the second hearing in July 2009, Reeder reported weighing 410 pounds (Tr. 593) and that she had been diagnosed with diabetes since the last hearing (Tr. 598).  She also testified that she has a foot that stays swollen all the time, arthritis in her knees, spurs in her left knee and heel, thyroid issues, and osteoarthritis in her hands.  (Tr. 596, 598, 607.)  According to Reeder, she can walk for about ten or fifteen minutes before having to sit down, cannot stand still for very

long, and can sit for an hour in a recliner before becoming uncomfortable because of arthritis in her tailbone. (Tr. 598-99.) She has trouble sitting in chairs with sides on them; if they are not wide enough, it is uncomfortable for her. (Tr. 600.) She also reported that she keeps her feet elevated a lot when she is sitting, especially her left leg because it always swells (Tr. 609), and that she just started using an assisted device for walking at home due to a recent car accident (Tr. 618).

### C. The VE's Testimony at the Hearing

An impartial VE also testified at the second hearing. (Tr. 614-34.) The ALJ posited to the VE a hypothetical of an individual between 44 and 50 years old, educated at the twelfth grade level, with the same past relevant work as Reeder, limited to lifting ten to twenty pounds occasionally and ten pounds frequently; sitting about six hours in an eight-hour workday; standing or walking about two hours; never climbing ladders, ropes, or scaffolds; occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling; and who must avoid concentrated exposure to hazards. (Tr. 619.) The VE concluded that such an individual could not perform Reeder's past relevant work, but could work as a receptionist, information clerk, appointment clerk, parking lot attendant, surveillance monitor, document preparer, and order clerk food and beverage. (Tr. 619, 621-22.) The VE also stated that, in his experience, an individual that misses more than one workday a month in an unskilled job will have difficulty sustaining competitive employment, but that employers would be a little more tolerant of absenteeism and tardiness during economic periods where there is an abundance of workers than in tighter economic situations. (Tr. 631.)

### D.  Summary of the Medical Evidence

In March 2001, Reeder complained to Dr. Lisa Lane, her family practitioner, of increasing knee pain.  (Tr. 178.)  Dr. Lane diagnosed her with patellar tendinitis.  (Tr. 178.)  Dr. James Chandler saw Reeder in August 2001, noting that she had severe osteoarthritis of the left knee and was grossly overweight.  (Tr. 177.)  One month later, Reeder returned to Dr. Lane, who prescribed Vioxx for her osteoarthritis.  (Tr. 177.)  An x-ray of her left knee showed mild degenerative changes involving the medial tibial femoral joint.  (Tr. 219.)

In early January 2002, Reeder called Dr. Lane's office, requesting that her October 25, 2001, lab diagnosis be changed from obesity to another diagnosis.  (Tr. 174.)  The treatment notes indicate that Dr. Lane then instructed that the diagnosis be changed from obesity to "abnormal weight gain/fatigue."  (Tr. 174.)

In June 2003, Reeder complained to Dr. Lane of pain in her back and sacral area, yet she was not noticeably tender to palpation; Dr. Lane diagnosed her with coccygeal inflammation of unknown etiology.  (Tr. 169.)  In September 2003, an x-ray showed a deformity involving the distal sacrum that was possibly related to remote trauma.  (Tr. 208.)

In October 2003, Reeder was seen by Dr. Lane for shortness of breath, explaining that she had recently went to the emergency room for a rapid heart rate but that her testing came back normal.  (Tr. 144, 168.)  A chest x-ray was normal, and she was given an inhaler to use as needed.  (Tr. 145, 204.)  A few days later, Dr. Lane noted that Reeder had hypothyroidism and adjusted her medication.  (Tr. 168.)

On November 3, 2003, at the request of Dr. Lane, Reeder visited Dr. Kenneth Smith, a rheumatologist, for her low back pain and knee discomfort.  (Tr. 132-33.)  During the

5

examination, Reeder moved freely without assistance, though she had mild patellar-femoral crepitus.  (Tr. 132.)  His examination of her feet revealed mild bilateral pes planus, and her back examination showed a straight non-tender spine with full painless movement in all directions.  (Tr. 132.)  She could walk without assistance, but did need help going up and down one step to the examination table.  (Tr. 132.)  A lumbar spine x-ray revealed minimal degenerative spondylosis and moderate facet osteoarthritis, but it was otherwise negative with no subluxation and fairly well-maintained disk spaces.  (Tr. 196.)  Dr. Smith thought that Reeder's pain was secondary to degenerative arthritis and her excessive weight, finding no evidence of underlying inflammatory rheumatic disease.  (Tr. 132.)

In December 2003, Dr. Lane saw Reeder for her chronic hypothyroidism.  (Tr. 167.)  She noted that Reeder was having difficulty maintaining her weight loss in that she thought Reeder might have gained back forty pounds of the weight previously lost.  (Tr. 167.)

On January 16, 2004, Dr. A. Lopez, a state agency physician, completed a Physical Residual Functional Capacity Assessment on Reeder's behalf.  (Tr. 148-55.)  Dr. Lopez found that Reeder could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally climb, balance, stoop, kneel, crouch, and crawl; and needed to avoid concentrated exposure to machinery and heights.  (Tr. 148-55.)  Dr. Lopez's opinion was later affirmed by another state agency physician.  (Tr. 155.)

In March 2004, Reeder visited Dr. Lane after recently having been to the emergency room for shortness of breath and tachycardia.  (Tr. 166.)  Dr. Lane thought that the shortness of breath and bronchospasm might be adult onset asthma or sleep apnea, and thus she ordered a

6

pulmonary function test, together with other testing for hyperglycemia.  (Tr. 166.)

In June 2004, Reeder saw Dr. Lane for increased swelling, explaining that it was difficult for her to even walk at one point.  (Tr. 246.)  On examination, Reeder's extremities had lower extremity edema but no pitting.  (Tr. 246.)  Dr. Lane adjusted Reeder's medication and assigned her a diagnosis of left axillary cellulitis, arthritis, and edema.  (Tr. 246.)

In November 2004, Dr. Lane completed paperwork at Reeder's request regarding her limitations and her illness, noting that Reeder's primary problems were the inflammation of her back and coccygeal region.  (Tr. 164.)  She also noted that Reeder had a history of hypothyroidism and asthma and that her arthritic knees inhibited some activity.  (Tr. 164.)  On examination, Reeder exhibited full range of motion of her neck, there were no wheezes in her lungs, and her heart had a regular rate and rhythm.  (Tr. 164.)  She was able to bend and stoop, though she was not able to hold that position for long, and she had some tenderness in her low back area.  (Tr. 164.)  Dr. Lane concluded that Reeder had chronic back and knee osteoarthritis that inhibited her ability to work full-time.  (Tr. 164.)

That same month, Dr. Lane also completed a Physical Residual Functional Capacity Questionnaire on Reeder's behalf, stating that Reeder was diagnosed with back and knee osteoarthritis, hypothyroidism, and asthma.  (Tr. 222-26.)  She noted that Reeder's symptoms included back and tailbone pain, shortness of breath, and swelling, and that her clinical findings and objective signs were slow gait, pain with bending and squatting, and reduced range of motion of the back and legs.  (Tr. 222.)  Dr. Lane opined that in an eight-hour workday Reeder could sit for six hours and stand or walk for two hours, provided that she could change positions at will; would need to take unscheduled breaks; could lift and/or carry up to twenty pounds

occasionally; could rarely twist and could never stoop, crouch, or climb; could not look up or

down, hold her head in a static position, or turn her head more than rarely; and that she would

miss more than four days a month of work due to her medical condition.  (Tr. 224-25.)

Dr. Lane saw Reeder again in December 2004 for joint pain.  (Tr. 164.)  Reeder told Dr.

Lane that her pain had more to do with upper body problems in the thoracic spine and arms than

in her lower body that she had been having trouble with before.  (Tr. 164.)  On examination,

Reeder's extremities were noticeably obese but there was no obvious edema.  (Tr. 164.)  Dr.

Lane adjusted her medication.  (Tr. 164.)

In November 2005, Reeder visited Dr. Lane, reporting that she had recently experienced

chest discomfort and that she had visited the emergency room and was told to use her inhaler,

which seemed to help.  (Tr. 238.)  Dr. Lane's assessment was sinusitis with asthma and chest

discomfort.  (Tr. 238.)  Reeder saw Dr. Lane again in March 2006 for a medication refill and for

a concern about her legs; Dr. Lane, however, noted no evidence of inflammation or erythema

upon examination.  (Tr. 237.)

Reeder returned to Dr. Lane once again in December 2006 regarding recent labs showing

mild hypothyroidism and her continued problems with weight gain, lower extremity neuropathy,

and burning in her feet.  (Tr. 537.)  Dr. Lane diagnosed her with hypothyroidism; hypertension;

non-insulin dependent diabetes; and chronic lower foot pain and peripheral neuropathy, most

likely related to her diabetes and hypothyroidism.  (Tr. 537.)

Also in December 2006, Dr. Michael Holton performed a consultative examination on

Reeder at the request of the Social Security Administration.  (Tr. 508-10.)  Reeder alleged

disability due to back pain, arthritis of the tailbone, knee problems, diabetes, a previous open

8

sore on her left foot, asthma, thyroid disease, hypertension, and stomach problems.  (Tr. 508.)
Dr. Holton indicated that Reeder performs dressing and hygiene measures independently, has no
problem sitting for up to about three hours, can stand at most about twenty minutes, and can
perhaps walk 1 ½ level blocks at a leisurely pace without significant increase in discomfort or
difficulty.  (Tr. 508.)  She further reported that she last weighed 407 pounds.  (Tr. 509.)  A
musculoskeletal exam revealed a waddling gait with moderate slowing, but no lateralization or
use of assistive measures.  (Tr. 509.)  Dr. Holton stated that, overall, her range of motion survey
was characterized with moderate generalized stiffness, but that he could not exclude
hypertrophic joint changes in the extremities due to obesity.  (Tr. 509-10.)  Ultimately, Dr.
Holton diagnosed Reeder with morbid obesity; chronic joint pain with probable underlying
degenerative joint disease; non-insulin diabetes; chronic lung disease (cannot exclude restrictive
along with obstructive active components); hypertension; and hypothyroidism.  (Tr. 510.)

In January 2007, Dr. J. Sands completed a Physical Residual Functional Capacity
Assessment on Reeder's behalf.  (Tr. 525-32.)  Dr. Sands concluded that Reeder could lift and/or
carry up to twenty pounds occasionally and up to ten pounds frequently; could stand and/or walk
for at least two hours in an eight-hour workday; could sit for a total of about six hours in an
eight-hour workday; could push and/or pull unlimited, other than as shown for lift and/or carry;
could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could never
climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to extreme heat and
humidity.  (Tr. 526-27, 529.)

Dr. Lane wrote a letter in February 2007, in which she opined that Reeder's obesity had
affected her ability to work by exacerbating or causing other medical problems, including

9

osteoarthritis, non-insulin dependent diabetes, irritable bowel syndrome, hypertension, and chronic foot pain with neuropathy. (Tr. 536.) Dr. Lane opined that in her current medical condition, it would be very difficult for Reeder to retain a position in a factory or other manual labor position. (Tr. 536.) The letter is not signed by Dr. Lane; Reeder's current weight is also left blank. (*See* Tr. 536.)

That same month, Reeder complained to Dr. Lane of continuing bilateral foot pain and reporting blood sugar levels of 150 at home; Dr. Lane diagnosed her with peripheral neuropathy, continued low back pain, non-insulin dependent diabetes, and allergic rhinitis. (Tr. 535.) In April, Dr. Lane rechecked Reeder's diabetes and found that her blood sugars were still running higher than desired. She concluded that Reeder suffered from non-insulin dependent diabetes, not under adequate control; GERD; hypertension; and hypothyroidism. (Tr. 534.)

In July 2007, Dr. Lane rechecked Reeder's diabetes, hypertension, hypothyroidism, and arthritis, concluding that they all seemed under control, but that Reeder reported being a little fatigued sometimes and that recent lab work revealed that her thyroid was not adequately managed. (Tr. 550.) In September, Reeder came to Dr. Lane complaining of upper abdominal pain and burning and discomfort that would not go away; Dr. Lane diagnosed her with acute GERD. (Tr. 550.) Dr. Lane saw Reeder again two weeks later for a recheck on the reflux and then in October for a cold. (Tr. 549.)

By January 2008, Reeder reported to Dr. Lane that she was currently having no problems. (Tr. 547.) On physical examination, Dr. Lane found that her extremities were positive for osteoarthritis pain and that she had decreased range of motion in her shoulders, elbows, hip, and knees. (Tr. 547.) In March, Reeder saw Dr. Lane complaining of chronic diarrhea; Dr. Lane

10

found that it was most likely due to irritable bowel and prescribed her medication.  (Tr. 543.)

Reeder returned two weeks later regarding her recent lab work, which showed that her sugars

were fairly normal but that her thyroid was off.  (Tr. 543.)  Reeder reported that she was still

suffering from a lot of joint pain; on physical exam, her extremities, especially her knees, were

positive for joint pain.  (Tr. 543.)  In July, Dr. Lane conducted a routine check of Reeder's

diabetes, hypertension, hypothyroidism, and osteoarthritis.  (Tr. 582.)  Reeder stated that, for the

most part, she was actually doing well since a previous medication change.  (Tr. 582.)

 Also in July 2008, Dr. Lane completed an Obesity Residual Functional Capacity

Questionnaire on Reeder's behalf, noting that she had been seeing Reeder since 2000.  (Tr. 556-

60.)  Dr. Lane reported that Reeder's current weight was 416 pounds and that Reeder had

gallbladder disease/gallstones (removed 18 years); GERD; diabetes; high blood pressure; high

cholesterol; and osteoarthritis, all related to her obesity.  (Tr. 556.)  Reeder's diagnosis was

"fair/good," and Dr. Lane found that her symptoms were pain, difficulty walking, shortness of

breath, and fatigue.  (Tr. 556.)  Dr. Lane further opined that Reeder experienced shortness of

breath with joint pain upon any exertion, could only walk short distances, that her pain and other

symptoms were severe enough to interfere frequently with her ability to do simple work tasks,

and she was capable of only low stress jobs.  (Tr. 556-57.)

 As for Reeder's functional limitations, Dr. Lane found that Reeder could walk for about

one city block without rest or severe pain; could sit for two to three hours at one time before

needing to get up; could stand for about twenty to forty-five minutes at a time; could sit for at

least six hours total in an eight-hour workday; and could stand or walk for less than two hours in

an eight-hour workday.  (Tr. 558.)  She also concluded that Reeder would need periods of

walking around during the day every thirty minutes for about five minutes at a time; a job that permitted shifting positions at will from sitting, standing, or walking; and unscheduled breaks. (Tr. 558-59.)  According to Dr. Lane, Reeder could lift and carry up to ten pounds occasionally, but could rarely lift and carry up to twenty pounds; and could occasionally twist, never stoop, crouch, or climb ladders, and only rarely climb stairs.  (Tr. 559.)  Ultimately, Dr. Lane determined that Reeder would likely miss more than four days of work per month due to her impairments or treatment.  (Tr. 560.)

In August 2008, Reeder reported to Dr. Lane that she was experiencing discomfort on her right axilla and had a lump there that comes and goes; Dr. Lane found no numbness of the upper extremities.  (Tr. 580.)  By November, Reeder was once again feeling short of breath, had gained ten pounds, and reported feeling like she was swollen.  (Tr. 576.)  In April 2009, Reeder requested more Xanax from Dr. Lane and reported that she was having trouble sleeping and intermittent problems with abscesses and boils under her arms.  (Tr. 571.)  Later that same month, Reeder went to the emergency room complaining of chest burning symptoms; Dr. Lane noted that a complete workup was negative and concluded that her chest pain was most likely from an anxiety attack and reflux.  (Tr. 571.)

Dr. Holton completed another consultative exam of Reeder in September 2009.  (Tr. 583-87.)  Reeder reported symptoms of degenerative arthritis in the lumbar region dating back six or seven years, the development of arthritic pain and stiffness in her left knee, occasional shooting pain and numbness into her thighs, a four to five year history of non-insulin dependent diabetes with associated numbness of the feet, a fifteen year history of hypertension, asthma since childhood that is associated with shortness of breath from exertion and weather changes, and

hypothyroidism.  (Tr. 583.)  Dr. Holton noted that, according to Reeder, she performs dressing

and hygiene measures independently, but with difficulty; can generally sit anywhere from sixty

to ninety minutes, stand twenty to thirty minutes, and walk for perhaps two level blocks at a

leisurely pace; has difficulty climbing; and that her knees give way due to lower extremity

numbness and knee pain.  (Tr. 583.)  Reeder stated that, as of a week ago, she weighed 422

pounds.  (Tr. 584.)  A musculoskeletal exam revealed a shuffling gait with mild associated

slowing, but no lateralization or use of assistive measures; significant decreased motion, possibly

suggesting underlying degenerative joint disease in many joints; and probable osteoarthritic

changes of the knees, but no gross instability of effusion.  (Tr. 585.)  Dr. Holton then diagnosed

Reeder with degenerative arthritis; non-insulin dependent diabetes, type II, with evidence of end

organ involvement; peripheral neuropathy; morbid obesity; chronic lung disease with

bronchospasm, likely mixed obstructive with restrictive components; hypertension; lower

extremity edema; and hypertension.  (Tr. 585-86.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted).  The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000).  Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."  *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

14

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, with respect to steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On December 16, 2009, the ALJ rendered his opinion. (Tr. 381-97.) He found at step one of the five-step analysis that Reeder had not engaged in substantial gainful activity since her alleged onset date through her date last insured, and, at step two, that her obesity, osteoarthritis of the knees, spondylosis of the lumbar spine, and facet osteoarthritis of L4-5 and L5-S1 were severe impairments. (Tr. 383.) At step three, he determined that Reeder's impairment or combination of impairments was not severe enough to meet a listing. (Tr. 384-85.) Before proceeding to step four, the ALJ determined that Reeder's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the following RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR [§] 404.1567(b) except the claimant can only stand/walk about two hours in an eight-hour workday. The claimant can never climb ladders, ropes

---

[3] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R. §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

or scaffolds; she can occasionally climb ramps, climb stairs, balance, stoop, kneel, crouch and crawl. The claimant should avoid concentrated exposures to hazards.

(Tr. 385.)

Moving onto step four, the ALJ found that Reeder was unable to perform any past relevant work. (Tr. 395.) At step five, however, the ALJ determined that Reeder could perform a significant number of jobs within the economy, including information clerk, parking lot attendant, surveillance system monitor, document preparer, and order clerk food and beverage. (Tr. 395-96.) Therefore, Reeder's claim for DIB was denied. (Tr. 396-97.)

### C. The ALJ's Consideration of Dr. Lane's Opinion Is Supported by Substantial Evidence and Does Not Contain Legal Error

Reeder advances several theories challenging the ALJ's discounting of Dr. Lane's opinion and his rejection of Dr. Lane's opinions concerning Reeder's absenteeism and head movement limitations. (*See* Opening Br. 18-21.) None of Reeder's arguments, however, necessitate a remand.

While the Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances," *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2), this principle is not absolute. Accordingly, "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 404.1527(d)(2). The Seventh Circuit has further recognized a treating physician's potential bias, stating, "[t]he patient's regular physician may want to do a favor for a friend and client, and so

16

the treating physician may too quickly find disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (quoting *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books*, 91 F.3d at 979. The Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2). Moreover, "an ALJ must articulate, at some minimum level, [his] analysis of the evidence. [He] is not required to address every piece of evidence or testimony, but must provide some glimpse into his reasoning," thereby creating "an accurate and logical bridge between the evidence and the result" and allowing the court "to trace the ALJ's path of reasoning." *Vincent v. Astrue*, 752 F. Supp. 2d 914, 925 (N.D. Ind. 2010) (internal quotation marks and citations omitted).

Here, the ALJ assigned less weight to the opinion of Dr. Lane, Reeder's treating physician, because Dr. Lane's own treatment notes failed to reveal the type of significant clinical and laboratory abnormalities one would expect if Reeder were in fact disabled (Tr. 392) and Dr. Lane relied quite heavily on Reeder's subjective report of symptoms and limitations, even changing a diagnosis at Reeder's request (Tr. 392). The ALJ also rejected Dr. Lane's restrictions on Reeder's ability to turn her head, look up, hold her head in any static position, and twist as

17

there was no diagnostic evidence to support these restrictions.  (Tr. 394.)  Finally, the ALJ

discounted Dr. Lane's conclusion that Reeder would miss at least four days of work a month

because Dr. Lane provided no basis for it.  (Tr. 394.)  On the other hand, the ALJ did adopt Dr.

Lane's opinion on Reeder's ability to stand, sit, and walk in his RFC.  (Tr. 394.)

   As to the ALJ's first reason for assigning less weight to Dr. Lane's opinion, Reeder

argues that the treatment notes of Dr. Lane, and her partner, Dr. Chandler, did provide significant

laboratory or clinical findings and that the ALJ improperly exercised medical judgment in

determining that one would not expect an individual with such findings to be disabled.  (Opening

Br. 18-19.)  According to the Seventh Circuit, cases requiring reversal because an ALJ

impermissibly "played doctor" are ones in which the ALJ failed to address relevant evidence,

*Dixon*, 270 F.3d at 1177; *see, e.g.*, *Clifford*, 227 F.3d at 870 (reversing because ALJ disregarded

treating physician's opinion that the claimant had arthritis without citing any conflicting

evidence in the record), or when the ALJ drew medical conclusions himself about a claimant

without relying on medical evidence, *see, e.g.*, *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000).

Moreover, an ALJ who rejects the medical opinions of record and then constructs his own RFC

without supporting medical evidence also impermissibly plays doctor.  *Bailey v. Barnhart*, 473

F. Supp. 2d 822, 839 (N.D. Ill. 2006); *see, e.g.*, *Amey v. Astrue*, No. 09 C 2712, 2012 WL

366522, at *13 (N.D. Ill. Feb. 2, 2012) (determining that the ALJ played doctor when he

constructed his own RFC by rejecting a physician's findings without explaining his reasons for

doing so); *Muzzarelli v. Astrue*, No. 10 C 7570, 2011 WL 5873793, at *26-27 (N.D. Ill. Nov. 18,

2011) (finding that the ALJ impermissibly "played doctor" by using his own judgment without

relying on any part of the record or on the medical expert's testimony).

In the instant case, the ALJ did none of these things.  Contrary to what Reeder argues, the ALJ did not use the lack of significant laboratory or clinical findings one would expect to find if Reeder was disabled to specifically discount Dr. Lane's opinion concerning Reeder's absenteeism (*see* Opening Br. 17, 19); rather, the ALJ pointed to this lack of significant laboratory or clinical findings as simply one reason why Dr. Lane's opinion was rendered less persuasive and as a part of an overall discussion questioning the motives behind Dr. Lane's opinion.  (*See* Tr. 391-92.)  In doing so, the ALJ did not fail to address relevant evidence, *see Dixon*, 270 F.3d at 1177; *Clifford*, 227 F.3d at 870, make conclusions himself about the claimant, *see Green*, 204 F.3d at 782, or construct his own RFC that was unsupported by medical evidence, *see, e.g.*, *Amey*, 2012 WL 366522, at *13.

Rather than "playing doctor," it appears as if the ALJ was making a determination about the reliability of Dr. Lane's opinion, deciding not to give Dr. Lane's opinion controlling weight because he doubted its reliability and perceived a probable bias.  (*See* Tr. 391 ("The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another.")); *see Dixon*, 270 F.3d at 1171 (finding that the ALJ decided not to give a treating physician's opinion controlling weight because she seriously doubted its credibility based on the ALJ's determination that the doctor was not completely objective).  According to the Seventh Circuit, "an ALJ may reject a treating physician's opinion over doubts about the physician's impartiality, particularly since treating physicians can be overly sympathetic to their patients' disability claims." *Labonne v. Astrue*, 341 F. App'x 220, 225 (7th Cir. 2009) (unpublished) (citing *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *Dixon*, 270 F.3d at 1177).  As such, "all but the most patently erroneous assessments of a

treating physician's bias" are upheld.  *Id.* (citing *Dixon*, 270 F.3d at 1177).  Considering this, and that the Court cannot substitute its judgment for the Commissioner's, *Brindisi*, 315 F.3d at 785, a remand is not warranted on this basis.

Furthermore, the ALJ did not stop his analysis of Reeder's disability claim or Dr. Lane's opinions at this point.  Instead, the ALJ considered the several opinions that Dr. Lane gave regarding the severity of Reeder's conditions and her limitations (Tr. 389-91), and then, after evaluating all of the medical evidence of record, incorporated Dr. Lane's limitations on Reeder's ability to sit, stand, and walk, but not her opinions on Reeder's head movement restrictions and probable absenteeism, into his RFC.  (Tr. 394.)  Therefore, rather than simply relying on his conclusion that Dr. Lane's treatment notes failed to reveal the type of significant clinical and laboratory abnormalities one would expect to find if Reeder were disabled to find that Reeder was *not* disabled, the ALJ continued on in the sequential process to fulfill his duty to determine Reeder's RFC, looking at all of the medical evidence of record, including Dr. Lane's opinions. "The ALJ has final responsibility for deciding a claimant's residual functional capacity, which is a legal decision rather than a medical one," *Lane v. Astrue*, No. 1:10-CV-28 JD, 2011 WL 3348095, at *11 (N.D. Ind. Aug. 3, 2011); *see* 20 C.F.R. §§ 404.1546(c), 404.1527(e), and the ALJ fulfilled that responsibility here.  As such—and because the ALJ also had other reasons, discussed below, for finding Dr. Lane's opinion less persuasive—any error the ALJ may have made in reaching this conclusion was ultimately harmless.  *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (concluding that an error is harmless when it "would not affect the outcome of the case").  Accordingly, Reeder's first theory challenging the ALJ's discounting of Dr. Lane's opinion fails.

Moving onto Reeder's second argument, as part of the ALJ's discussion concerning the reliability of Dr. Lane's opinion, the ALJ pointed out that Reeder had previously called Dr. Lane's office requesting a lab diagnosis to be changed from obesity to another diagnosis, a request which Dr. Lane then agreed to, changing the obesity diagnosis to "abnormal weight gain/fatigue." (Tr. 392; *see* Tr. 174.) Reeder argues that the ALJ's reliance on this changed diagnosis to discount Dr. Lane's opinion was improper because the change may have been appropriate, the ALJ did not argue that there was something wrong with the new diagnosis, and the ALJ was once again impermissibly "playing doctor." (Opening Br. 19-20.) In his opinion, however, the ALJ used this changed diagnosis as an example of how Dr. Lane apparently relied quite heavily on Reeder's subjective report of her symptoms and limitations and seemed to uncritically accept as true most, if not all, of what Reeder reported. (Tr. 392.) An ALJ may permissibly consider such evidence suggesting that a treating physician is not completely objective. *See Dixon*, 270 F.3d at 1177.

In *Dixon*, the Seventh Circuit found that substantial evidence supported the ALJ's decision not to give controlling weight to a treating physician's opinion because she seriously doubted its credibility. *Id.* This evidence included that the treating physician termed the claimant's arthritis "very severe" and prescribed a cane, despite contrary evidence from X-rays and orthopedic specialists; that the treating physician accepted the claimant's complaints about blurred vision at face value, even though repeated ophthalmology exams failed to show any significant abnormalities; and that the physician expressed her opinion that the claimant would miss more than twenty days of work per year by writing "yes" next to a question the claimant's attorney had pre-typed and without elaborating any basis for it. *Id.* When the claimant argued

21

on appeal that the ALJ had improperly substituted her own judgment for that of a medical

professional, the Seventh Circuit held that the ALJ thoroughly discussed the medical evidence in

making her decision and did not play doctor.  *Id.* at 1177-78.

Here, while not as suggestive as the evidence of sympathy in *Dixon*, the diagnosis that

Dr. Lane changed at Reeder's request is significant and lends credence to the ALJ's conclusion

that Dr. Lane's opinion was rendered less persuasive as it may have been motivated by an effort

to assist or avoid unnecessary tension with Reeder.  And, as the Seventh Circuit has noted, this is

a permissible, and necessary, analysis.  *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir.

2008) (stating that a treating physician's opinion may be unreliable if the doctor is sympathetic);

*Dixon*, 270 F.3d at 1177 (stating that the Court "must keep in mind the biases that a treating

physician may bring to the disability evaluation"); *Books*, 91 F.3d at 979 (noting that "[t]he

patient's regular physician may want to do a favor for a friend and client, and so the treating

physician may too quickly find disability").  The ALJ reasonably concluded that this changed

diagnosis called into question Dr. Lane's impartiality, and, once again, all but the most patently

erroneous assessments of a treating physician's bias are upheld.  *Labonne*, 341 F. App'x at 225;

*see Dixon*, 270 F.3d at 1177.  As such, a remand is not warranted on this basis.

Next, Reeder argues that the ALJ was "playing doctor" when he determined that Dr.

Lane's restrictions on Reeder's head movements were not supported by any diagnostic evidence.

(Tr. 394.)  Reeder's own listing of Dr. Lane's laboratory and clinical findings as well as Dr.

Lane's treatment notes, however, fail to reveal any evidence that could reasonably account for

such limitations, such as dizziness induced by head movement, *Suffi v. Astrue*, No. 10 C 2443,

2011 WL 1706139, at *4 (N.D. Ill. May 5, 2011), or problems with the cervical spine, *see*

*Anderson v. Astrue*, No. 08-cv-499-bbc, 2009 WL 2028297, at *2 (W.D. Wis. July 8, 2009). Most of Reeder's medical problems seem focused in her knees (crepitus bilaterally in her knee (Tr. 178); severe osteoarthritis of the left knee (Tr. 177); mild degenerative changes in the medial tibial femoral joint of her left knee (Tr. 219); and noticeable osteoarthritic changes in the knees (Tr. 175)), her lower back (a deformity in the distal sacrum (Tr. 208); tenderness in the low back area (Tr. 164); and reduced range of motion of the back and legs (Tr. 222)), and her lower extremities in general (edema in the lower extremities (Tr. 246); pain with bending and squatting (Tr. 222); and lower extremity neuropathy and burning feet (Tr. 537)).  Moreover, Dr. Lane's treatment notes fail to include any complaints from Reeder about difficulty looking down, turning her head, looking up, holding her head in a static position, or twisting,[4] movements which Dr. Lane opined in 2004 that Reeder could perform only "rarely."[5]  (Tr. 225.) Therefore, substantial evidence supports the ALJ's conclusion that Dr. Lane's 2004 limitations on Reeder's head movements were not backed up by any diagnostic evidence.  The ALJ was not "playing doctor," but rather fulfilling his duty to determine whether Dr. Lane's opinion was supported by medical findings.  *See* 20 CFR § 404.1527(d)(2); SSR 96-2p.

Along with challenging the ALJ's reasons for rejecting Dr. Lane's restrictions on Reeder's head movements, Reeder also argues that the ALJ's reason for rejecting Dr. Lane's opinion that Reeder would likely miss more than four days of work per month due to her

---

[4] Dr. Lane's treatment notes from December 2004 indicate that Reeder reported experiencing joint pain that "at this point" had more to do with "upper body problems in the thoracic spine and arms as opposed to lower body that she had been having trouble with before."  (Tr. 164.)  These notes, however, do not specify where in the upper body that pain was located and, more importantly, were penned *after* Dr. Lane concluded on November 19, 2004, that Reeder was limited in her head movements.  As a matter of fact, Dr. Lane wrote in her treatment notes from this same date, November 19, 2004, that Reeder had full range of motion in her neck.  (Tr. 164.)

[5] In July 2008, Dr. Lane opined that Reeder could twist "occasionally" in an Obesity RFC Questionnaire. (Tr. 559.)  Dr. Lane was not asked about head movement restrictions in this questionnaire.

23

impairments or treatment (*see* Tr. 225, 560)—that Dr. Lane did not provide any basis for this

conclusion (Tr. 394)—is not supported by substantial evidence because the ALJ did not mention

that the non-examining State agency doctors also failed to provide a basis for their conclusions.

(Opening Br. 20.)  At step three, however, Reeder, and not the Commissioner, "bears the burden

of proving that she is disabled, and [Reeder] failed to present any medical evidence linking [her

conditions] to the unacceptable level of absenteeism she alleges." *Castile v. Astrue*, 617 F.3d

923, 927 (7th Cir. 2010) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1512(a)).  Besides

trips to the emergency room in October 2003 for a rapid heart rate (Tr. 144), March 2004 for

shortness of breath and tachycardia (Tr. 166), November 2005 for chest discomfort (Tr. 238),

and April 2009 for chest burning symptoms (Tr. 571), there is no evidence that Reeder had to

take frequent trips to the hospital for treatment, necessitating that she miss work, *see Brown v.

Astrue*, No. 1:10-CV-00450, 2011 WL 5102276, at *8-9 (N.D. Ind. Oct. 27, 2011), or that she

frequently missed appointments, which could translate into absences from work, *see Punzio v.

Astrue*, 630 F.3d 704, 711 (7th Cir. 2011) (finding a treating psychiatrist's conclusion about the

claimant's propensity for absenteeism adequately supported by frequent missed appointments in

the record).

   In *Brown*, the claimant's condition sometimes required admission into the hospital for

infusions.  2011 WL 5102276, at *9.  Despite the treating physician's opinion that the claimant

would be absent from work more than four days per month, the ALJ conducted an examination

of the claimant's hospital records, concluding that the records did not support a finding that the

claimant's absences would exceed an average of one day per month on a sustained basis, a

determination upheld on appeal.  *Id.*  In this case, even less evidence supported Dr. Lane's

conclusion concerning Reeder's absenteeism; there were no such hospital records to peruse or any evidence of continued and frequent treatment that would require Reeder to miss work more than four days per month, providing more support for the ALJ's rejection of this conclusion.

Nonetheless, Reeder argues that she had numerous conditions that produce pain which were exacerbated by her obesity, for which pain relief treatment had been problematic, and which would affect her ability to sit, stand, and walk such that Dr. Lane could conclude that she would need to take a few days off during the month to control this pain.  (Reply 2.)  The problem with this argument, however, is that Dr. Lane never said that Reeder would miss work more than four days per month to control her pain; rather, Dr. Lane provided *no basis or explanation whatsoever* for this high rate of absenteeism or why Reeder would to need to miss work, which is exactly why the ALJ rejected the opinion.  For the ALJ to make such an assumption—that the basis for Dr. Lane's conclusion that Reeder would miss more than four days of work per month was that Reeder would have to take days off to control her pain—would amount to the ALJ substituting his judgment for that of Dr. Lane, which is impermissible.  *See Clifford*, 227 F.3d at 870.  Therefore, the ALJ's rejection of Dr. Lane's unexplained opinion regarding Reeder's absenteeism is supported by substantial evidence and does not warrant a remand.

Not to be deterred, Reeder argues that the ALJ did not give weight to Dr. Lane's opinion on absenteeism because the diagnostic evidence supported only those limitations found in his RFC, which were supported by the evidence of record and the State agency doctors, and that, therefore, the opinions of the State agency doctors, who provided no explanation for their findings, played a part in the weight given to Dr. Lane's opinion and the ALJ's RFC.  (Reply 4-5.)  First, "the evidence of record" that supports the ALJ's assigned RFC includes Dr. Lane's

opinions concerning Reeder's ability to stand, sit, and walk.  (Tr. 394.)  Although the ALJ did

not incorporate Dr. Lane's opinions regarding Reeder's ability to perform head movements and

her expected rate of absenteeism into his RFC, "the ALJ is not required to rely entirely on a

particular physician's opinion or choose between the opinions of any of the claimant's

physicians."  *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).  Moreover, although the ALJ

may decide to adopt all of the opinions expressed in a medical source statement, a medical

source statement must not be equated with the ALJ's assigned RFC, SSR 96-5p, "which is a

legal decision rather than a medical one," *Lane*, 2011 WL 3348095, at *11.  Rather, the ALJ

must consider the entire record, including all relevant medical and nonmedical evidence—which,

in this case, would include the opinions of the State agency doctors—as well as the claimant's

own statement about what she is able or unable to do.  *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th

Cir. 1995).  While Reeder is correct that the ALJ's consideration of the opinions of Dr. Lane and

the State agency doctors were interconnected, the ALJ's stated reason for rejecting Dr. Lane's

opinion concerning Reeder's absenteeism was that Dr. Lane did not provide a basis for this

conclusion, a determination that, as noted above, was supported by substantial evidence.  As

such, the ALJ articulated his reasoning and did enough to survive a remand on this basis.

Lastly, Reeder asserts that the ALJ committed legal error at step three by not explicitly

addressing the checklist of factors under 20 CFR § 404.1527(d)(2)[6] in considering Dr. Lane's

opinion as Reeder's treating physician.  (Opening Br. 20-21.)  "It is true that [20 C.F.R. §

404.1527(d)(2)] requires the ALJ to consider those six factors, but his decision need only include

---

[6] These factors are, once again, (1) the length of the treatment relationship and frequency of examination;
(2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the
consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6)
any other factors brought to the attention of the Commissioner.

'good reasons' for the weight given to the treating source's opinion rather than 'an exhaustive factor-by-factor analysis.'" *Hanson v. Astrue*, No. 10-C-0684, 2011 WL 1356946, at *12 (E.D. Wis. Apr. 9, 2011) (quoting *Francis v. Comm'r Soc. Sec. Admin.*, No. 09-6263, 2011 WL 915719, at *3 (6th Cir. Mar. 16, 2011)); *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) ("Ms. Oldham cites no law, and we have found none, requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."); *Brown v. Barnhart*, 298 F. Supp. 2d 773, 792 (E.D. Wis. 2004) (stating that there is no "*articulation* requirement for each and every factor" and that "ALJs are not required to produce prolix opinions containing checklists from all of the regulations" (emphasis in original)). Moreover, as the Commissioner has recognized, "[n]ot every factor for weighing opinion evidence will apply in every case." SSR 06-03p. "Rather, the ALJ must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning." *Brown*, 298 F. Supp. 2d at 792. Therefore, it is enough if the ALJ generally covers the ground of 20 C.F.R. § 404.1527(d)(2) and provides "good reasons" for the weight assigned to the treating physician's opinion. *See Hanson*, 2011 WL 1356946, at *12; *accord Oldham*, 509 F.3d at 1258 (noting that the ALJ provided good reasons for the weight he gave to the treating sources' opinion and concluding that "[n]othing more was required in this case").

Here, while the ALJ does not explicitly apply every checklist factor in the sections in which he questions Dr. Lane's reliability and rejects Dr. Lane's opinions about Reeder's head movement restrictions and absenteeism, the ALJ does consider these factors elsewhere in his opinion. For instance, the ALJ explicitly recognized that, as Reeder testified, she had been

27

seeing Dr. Lane for at least ten years, about three or four times a year (Tr. 387), and that Dr. Lane stated in a 2007 letter that Reeder had been treated in her office since 1997 (Tr. 390). The ALJ also notes the nature and extent of the treatment relationship, referring to Dr. Lane as Reeder's treating physician (Tr. 394) and stating that Reeder had testified that Dr. Lane does testing and prescribes her medications (Tr. 387), and acknowledges Dr. Lane as a family doctor, implicitly addressing whether Dr. Lane is a specialist (Tr. 387).

In terms of the amount of supporting evidence, the ALJ goes into detail concerning Dr. Lane's 2004 Physical RFC Questionnaire, 2007 letter, and 2008 Obesity RFC Questionnaire (Tr. 389-91), notes Reeder's numerous visits to Dr. Lane before, between, and after these opinions (Tr. 388-92), and specifically addresses Dr. Lane's opinions concerning Reeder's limitations, several of which the ALJ adopts in his RFC (Tr. 385, 394). When rejecting the portions of Dr. Lane's opinion regarding Reeder's head movement restrictions and her probable absenteeism, the ALJ focuses primarily on the lack of medical findings or explanation for these conclusions. (*See* Tr. 394.) Thus, the ALJ generally covered the ground of the checklist factors and provided good reasons for the weight he assigned to Dr. Lane's opinion; nothing more is required in this case.[7] *Oldham*, 509 F.3d at 1258.

Despite the various challenges Reeder advances against the ALJ's consideration of Dr.

---

[7] Reeder also poses a sixth theory challenging the ALJ's treatment of Dr. Lane's opinion. Specifically, Reeder argues that "an ALJ's determination of whether the treating doctor's opinion is both well-supported by medically acceptable diagnostic techniques and consistent with other evidence in the record is deficient to determine that a doctor has not opined objectively." (Opening Br. 21.) As the Court cannot decipher what Reeder is arguing—and Reeder's Reply does not make this argument any clearer or develop it further—it cannot respond to this argument. If, as the Commissioner interprets it, Reeder is objecting to the ALJ's comment that Dr. Lane's limitations may have resulted from her effort to assist a patient with whom she sympathized or to avoid unnecessary doctor/patient tension, as discussed above, the Seventh Circuit has approved such an analysis and cautioned ALJ's to be aware of a treating physician's potential bias. *See Ketelboeter*, 550 F.3d at 625; *Dixon*, 270 F.3d at 1177; *Books*, 91 F.3d at 979. As such, this undeveloped and unclear argument cannot warrant a remand.

Lane's opinion, the ALJ's determination that Dr. Lane's opinion was less persuasive because of her potential bias or sympathy, as the diagnosis Dr. Lane changed at Reeder's request suggests; the ALJ's rejection of Dr. Lane's limitations on Reeder's head movements because they were not supported by diagnostic evidence; and the ALJ's discounting of Dr. Lane's opinion concerning Reeder's absenteeism, for which Dr. Lane provided no basis, are supported by substantial evidence. Moreover, the ALJ adequately articulated his reasoning, thereby creating "an accurate and logical bridge between the evidence and the result" and allowing this Court to trace his path of reasoning. *Vincent*, 752 F. Supp. 2d at 925. Accordingly, the ALJ has done enough to survive a remand.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Reeder.

SO ORDERED.

Enter for this 19th day of March, 2012.

S/Roger B. Cosbey\
Roger B. Cosbey,\
United States Magistrate Judge

29